## IN THE UNITED STATES DISTRICT COURT
### FOR THE _EASTERN___ DISTRICT OF _CALIFORNIA_
### ____FRESNO_____ DIVISION

_LORENA GUTHRIE_____
(Print your full name)

        Plaintiff *pro se*,

  v.

_MARK S. INCH, DIRECTOR, FEDERAL___
 BUREAU OF PRISONS,

_____

_____
(Print full name of each defendant; an
employer is usually the defendant)

       Defendant(s).

CIVIL ACTION FILE NO.

_____

(to be assigned by Clerk)

## *PRO SE* EMPLOYMENT DISCRIMINATION COMPLAINT FORM

### Claims and Jurisdiction

1.    This employment discrimination lawsuit is brought under (check only those that apply):

    ___X___    Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., for employment discrimination on the basis of race, color, religion, sex, or national origin, or retaliation for exercising rights under this statute.

                **NOTE**: To sue under Title VII, you generally must have received a notice of right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC").

_____ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq., for employment discrimination against persons age 40 and over, or retaliation for exercising rights under this statute.

> **NOTE**: To sue under the Age Discrimination in Employment Act, you generally must first file a charge of discrimination with the EEOC.

_____ Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., for employment discrimination on the basis of disability, or retaliation for exercising rights under this statute.

> **NOTE**: To sue under the Americans With Disabilities Act, you generally must have received a notice of right-to-sue letter from the EEOC.

_____ Other (describe) _____

_____

_____

_____

_____

_____


2.   This Court has subject matter jurisdiction over this case under the above-listed statutes and under 28 U.S.C. §§ 1331 and 1343.

## Parties

3.    Plaintiff.    Print your full name and mailing address below:

Name        Lorena Guthrie

Address     312 Pamela Court
            Merced, CA 95340
            Tel.:(209) 947-4885
            E-Mail: marvmarg6366@yahoo.com

4.    Defendant(s).    Print below the name and address of each defendant listed
                       on page 1 of this form:

Name        Mark S. Inch, Director, Federal Bureau of Prisons

Address     Federal Bureau of Prisons
            320 First St., NW
            Washington, DC 20534

Name

Address

Name

Address

## Location and Time

5.    If the alleged discriminatory conduct occurred at a location different from the
      address provided for defendant(s), state where that discrimination occurred:

      USP Atwater - Mendota, 1 Federal Way, Atwater, CA 95301

6.      When did the alleged discrimination occur?  (State date or time period)

      **Begining in May 2008 and continuing until my constructive discharge in October 2009**

_____

_____

_____


## **Administrative Procedures**

7.      Did you file a charge of discrimination against defendant(s) with the EEOC or
any other federal agency?      __x__ Yes      _____ No

      If you checked "Yes," attach a copy of the charge to this complaint.


8.      Have you received a Notice of Right-to-Sue letter from the EEOC?

      _____ Yes      __x__ No **\* but nonetheless entitled to sue in federal court purusant
to  29 CFR § 1614.408 (see ¶ 11 below)**

      If you checked "Yes," attach a copy of that letter to this complaint and
state  the  date  on  which  you  received  that  letter:

      _____


9.      If you are suing for **age discrimination**, check one of the following:

      _____      60 days or more have elapsed since I filed my charge of age
discrimination with the EEOC

      _____      Less than 60 days have passed since I filed my charge of age
discrimination with the EEOC

10.   Did you file a complaint against the defendant(s) with a State agency?

_____ Yes        __x__ No

If you checked "Yes," attach a copy of the complaint to that agency, your right-to-sue letter and describe below what happened with it:

_____

_____

_____

_____

11.   If you were employed by a Federal agency or unsuccessfully sought employment with a Federal agency, did you complete the administrative process established by that agency for persons alleging denial of equal employment opportunity?

__x__ Yes        _____ No        _____ Not applicable, because I was not an employee of, or applicant with, a Federal agency.

If you checked "Yes," describe below what happened in that administrative process:

**I am entitled to sue in federal district court as per applicable regulations, because more than 180 days have passed from the day I filed my formal complaint of discrimination on March 23, 2010 and the Bureau of Prisons still has not issued a final agency decision.  My complaint was accepted for investigation on April 21, 2010 and remains pending decision.  Administrative proceedings before the EEOC have remained pending for more than 7 years without a hearing being held or a decision being made.  29 CFR § 1614.408.**

## Nature of the Case

12.  The conduct complained about in this lawsuit involves (check only those that apply):

|   |   |
|---|---|
| _____ | failure to hire me |
| __x__ | failure to promote me |
| _____ | demotion |
| _____ | reduction in my wages |
| __x__ | working under terms and conditions of employment that differed from similarly situated employees |
| __x__ | harassment |
| __x__ | retaliation |
| __x__ | termination of my employment |
| _____ | failure to accommodate my disability |
| __x__ | other (please specify)  **reprisal for prior EEO and EEOC activity** |

13.  I believe that I was discriminated against because of (check only those that apply):

|   |   |
|---|---|
| _____ | my race or color, which is _____ |
| _____ | my religion, which is _____ |
| __x__ | my sex (gender), which is _____ male   __x__ female |
| _____ | my national origin, which is _____ |
| _____ | my age  (my date of birth is _____) |
| _____ | my disability or perceived disability, which is: |

_____

| __x__ | my opposition to a practice of my employer that I believe violated the federal anti-discrimination laws or my participation in an EEOC investigation |
|---|---|

| __x__ | other (please specify) **reprisal for prior complaint of sexually inappropriate conduct** |
|---|---|

14. Write below, as clearly as possible, the essential facts of your claim(s). Describe specifically the conduct that you believe was discriminatory or retaliatory and how each defendant was involved. Include any facts which show that the actions you are complaining about were discriminatory or retaliatory. Take time to organize your statements; you may use numbered paragraphs if you find that helpful. Do not make legal arguments or cite cases or statutes.

During the tenure of former USP Atwater Warden Hector Rios, a sexually charged, and gender discriminatory environment prevailed at the prison. I was denied preferred work assignments, job benefits, and advancement, access to information pertinent to my job duties, and I was subjected to undue scrutiny and criticism of my job performance. I was also denied promised opportunities to utilize my nursing training to obtain advancement within the institution. In response to my informal complaints not only about these matters but also about being subjected to sexually charged, rude comments from my supervisor, Jesse Estrada, I was the subject of an investigation of falsified allegations of misconduct which threatened not only to ruin my law enforcment career but my ability to be licensed as a health care professional. These false allegations and the ostracization to which I was subjected at USP Atwater also had marked consequences on my physical health and mental well being. As a result, I left my employment in October 2009 and lost out on a promising BOP career, as well as the benefits and compensation I could have received.

At a related EEOC hearing, involving other female USP Atwater employees, those involved in the retaliatory investigation against me, Charles Carstersen, Jesse Estrada, and Warden Rios, all testified that the investigation against me was specifically ordered by Warden Rios, conducted by Mr. Estrada (the same official against whom I had complained), and required Mr. Carstersen to violated BOP policy and the law, which he refused to do despite orders from his superiors to find something to "bust me on."

As a result of the unfortunate delays in these proceedings, my reinstatement is no longer a possibility, and I therefore am entitled to be compensated for my general and economic damages suffered as a result of the above-summarized misconduct.
I am attaching hereto the administrative hearing testimonies of Messrs. Carstersen, Estrada and Rios, which confirms my allegations.

15.   Plaintiff      _____      still works for defendant(s)
                     __x__      no longer works for defendant(s) or was not hired

16.   If this is a disability-related claim, did defendant(s) deny a request for
      reasonable accommodation?      _____ Yes      _____ No

           If you checked "Yes," please explain: _____

           _____

           _____

           _____

           _____

17.   If your case goes to trial, it will be heard by a judge <u>unless</u> you elect a jury
      trial.  Do you request a jury trial?      _x_ Yes      _____ No

<b><u>Request for Relief</u></b>

As relief from the allegations of discrimination and/or retaliation stated above,
plaintiff prays that the Court grant the following relief (check any that apply):

      __x__      Defendant(s) be directed to **end their widespread practice of reprisal against
                 employees who complain of gener discrimination , sexual harassment, and other
                 related misconduct** _____

      __x__      Money damages (list amounts) **to be determined according to proof**

           _____

      __x__      Costs and fees involved in litigating this case

      __x__      Such other relief as my be appropriate

Page 8 of 9

## PLEASE READ BEFORE SIGNING THIS COMPLAINT

Before you sign this Complaint and file it with the Clerk, please review Rule 11 of the Federal Rules of Civil Procedure for a full description of your obligation of good faith in filing this Complaint and any motion or pleading in this Court, as well as the sanctions that may be imposed by the Court when a litigant (whether plaintiff or defendant) violates the provisions of Rule 11. These sanctions may include an order directing you to pay part or all of the reasonable attorney's fees and other expenses incurred by the defendant(s). Finally, if the defendant(s) is the prevailing party in this lawsuit, costs (other than attorney's fees) may be imposed upon you under Federal Rule of Civil Procedure 54(d)(1).

Signed, this __26th__ day of __February_____, 20__18____

__/s/ Lorena Guthrie_____
(Signature of plaintiff *pro se*)

__Lorena Guthrie_____
(Printed name of plaintiff *pro se*)

__312 Pamela Court_____
(street address)

__Merced, CA 95340_____
(City, State, and zip code)

__marvmarg6366@yahoo.com____
(email address)

__(209) 947-4885_____
(telephone number)

# ATTACHMENT TO COMPLAINT

1         BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2                      SAN FRANCISCO DISTRICT OFFICE

3                                        MINISTRATIVE JUDGE

4

5    KIMBERLY A. KODGER,                )
     KATHY BURGHARDT-COBB,              ) EEOC CASE NUMBERS:
6    JUDITH DREHER, AND                 )  480-2011-00499X
     LOURDES METTRY,                    )  480-2011-00496X
7                                       )  480-2011-00548X
                       Complainants,    )  480-2011-00497X
8                                       )
            vs.                         )
9                                       )
     ERIC H. HOLDER, JR.,               )
10   U.S. ATTORNEY GENERAL,             )
     U.S. DEPARTMENT OF JUSTICE,        )
11   FEDERAL BUREAU OF PRISONS,         )
                                        )
12                        Agency.       )
     _____)
13

14

15                    ADMINISTRATIVE HEARING

16

17

18

19

20

21

22

23

     Reported by:
24   Victoria L. Valine, CSR, RMR, CRR
     CSR License No. 3036
25   Job No. 140728VV

                                                          1

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

1  Q.  And how is that?  Could you explain the risk

2  concern, the safety concern?

3  A.  You don't want to over sexualize anything in the

4  institution.  You don't want to draw attention to

5  yourself, especially in a sexual nature.  It sends the

6  wrong message to the inmates.  I mean, you're dealing

7  with men that are locked up, some of them for the rest of

8  their lives.  You don't want to make things any more

9  difficult than what it already is.

10  Q.  Mr. Carstersen, in your position with the Bureau

11  of Prisons, have you ever been -- I'm sorry.  How many

12  years have you had?  I believe seven.  Is that right?

13  A.  About seven years.

14  Q.  In those seven years have you ever been

15  requested to surveil an employee before?

16  A.  Yes.

17  Q.  And who was that?

18  A.  That was the SIS tech Guthrie.

19  Q.  Lorena Guthrie?

20  A.  Yes.

21  Q.  And who asked you to surveil Ms. Lorena Guthrie?

22  A.  First it was the SIA Estrada.  And then after I

23  refused to do it for him, five minutes later the warden

24  was making the same request.

25  Q.  And just starting with SIA Estrada, did he say

1    anything to you as to why he was requesting that you

2    surveil Ms. Guthrie?

3          THE COURT:  Well, let me ask this:  How is this

4    relevant to the claim?

5          MS. JUAREZ:  Your Honor, just shows a pattern

6    and practice of surveillance, also goes to retaliation

7    that Mr. Carstersen suffered himself.  Mr. Carstersen has

8    a history of standing up for women who are being

9    discriminated against in the institution.  And, Your

10   Honor, he was also asked to surveil Dr. Kodger, which is

11   an important factor --

12         THE COURT:  Well, it would be if I heard

13   testimony that he had been asked to surveil Kodger or

14   Villapudua.  From what I understand, it was Ms. Guthrie.

15   Then it's morphed into he's been reprised against in his

16   estimation.  And this is going to show a pattern of

17   reprisal supposedly with these women, which I don't see

18   how that links up necessarily.  But I don't know what the

19   nature of the reprisal is.  And -- so what were you going

20   to say?

21         MR. BAUCH:  I'm objecting to it.  Ms. Guthrie is

22   not a department head and --

23         THE COURT:  Well, I don't know what that has to

24   do with anything.

25         MR. BAUCH:  Well -- information -- but then the

                                                    1380

1   other thing is we don't know the type of surveillance.   I

2   mean, surveillance is a very broad term.

3           MS. JUAREZ:   Your Honor, I'm just laying a

4   foundation for the future questioning related to the

5   PDS --

6           THE COURT:   PDS, who's --

7           MS. JUAREZ:   PDS is psychology data system.

8   There's been testimony, Your Honor, that there was

9   unlawful access into the PDS system.

10          THE COURT:   That's true.

11          And so it's just foundation for Dr. Kodger.

12  And, again, it's just establishing a practice of

13  surveilling.

14          THE COURT:   Well, this is the first time I've

15  heard about any surveilling.   So I don't know how it's

16  going to establish a pattern or practice.   I'm concerned

17  that we're going to get off into Ms. Guthrie's case,

18  which is a separate case, in any event.   And I don't see

19  how, until I hear a little bit more, I guess, how you're

20  going to tie it up with the alleged reprisal against

21  Dr. Kodger or others.

22          MR. LITTLE:   I can make an offer to produce

23  proof, Your Honor.   Guthrie complained about --

24          THE COURT:   Ms. Guthrie is your client?

25          MR. LITTLE:   She is.   She has made complaints

1381

 1   about sexually inappropriate comments that were made to

 2   her by Mr. Estrada.  In the aftermath of that complaint,

 3   Mr. Carstersen was asked to surveil her and then -- first

 4   by Mr. Estrada and then by the warden.  One of our claims

 5   in this case is that these women --

 6            THE COURT:  In this case or --

 7            MR. LITTLE:  In this case.  And then this is --

 8   Ms. Guthrie is -- which was part of the motion to

 9   eliminate.  These women all complained about various

10   violations of policy alike to the warden and were, we

11   contend, retaliated against.  And this shows -- this is

12   very important evidence I would submit because

13   Mr. Carstersen is one of the few people who can show that

14   that request for what we contend was retaliation came

15   straight from the warden's mouth.

16            MS. JUAREZ:  Your Honor, I also believe it shows

17   the potentiality of the discrimination and the targeting

18   of those women, and not that it was just a happenstance

19   coincidence that these four individuals were

20   discriminated against, Your Honor.  So it goes to the

21   prima facie case of discrimination.

22            MR. BAUCH:  I don't think it's relevant.  I

23   think that it's -- it's a tie in to the other cases

24   before Your Honor in representation by Mr. Little.  And I

25   just don't think that it's an appropriate line of

                                                      1382

1  questioning for trying to prove retaliation for

2  Dr. Kodger.  I understand if they want us not to testify

3  about Dr. Kodger and what happened to her, but this is

4  really far afield since this is a nonbargaining unit SIS

5  tech that worked under -- in another department than

6  Dr. Kodger.  So --

7       THE COURT:  Well, I'm going to overrule the

8  objection to this extent.  I'll allow testimony with

9  respect to what he was asked to do with respect to

10 conversations that he had with the Associate Warden

11 Estrada or the Warden Rios and what he understood he was

12 supposed to be doing.  As I understand, you're going to

13 tie this up either now or later with what he or someone

14 was asked to do with Dr. Kodger; is that correct.

15       MS. JUAREZ:  Yes, Your Honor.

16       THE COURT:  With respect to the reprisal

17 allegations, that's more difficult, because:  (A) I don't

18 know who he would allege -- I don't know what protected

19 activity he's going to say he took part of.  So just

20 thinking for a moment here.  Being asked to surveil

21 someone isn't necessarily an EEO protected activity.  So

22 if he somehow didn't do that right or well or got on the

23 wrong side of somebody because of what he did or didn't

24 do, I'm not sure how that's reprisal in the sense that --

25 for complainants.  Now, if you're somehow able to get

                                                    1383

1  something in here that shows how there is similar EEO

2  reprisal with Mr. Carstersen and the principals who are

3  alleged to have reprised against the four women, then

4  that's a different matter.  You'll have to lay that basis

5  because it's not apparent to me.

6          MS. JUAREZ:  It will be.  Ill make sure of that,

7  Your Honor.

8          THE COURT:  Okay.  Go ahead.  The objection is

9  overruled with that understanding.

10  BY MS. JUAREZ:

11      Q.  Mr. Carstersen, before the lengthy objection

12  process that we just had, you had mentioned that

13  SIA Estrada and then again Warden Rios had asked you to

14  surveil Ms. Lorena Guthrie.

15          MR. BAUCH:  Objection, Your Honor.  If this is

16  going to be a compound question, I'd ask that she break

17  it down for us.

18          MS. JUAREZ:  I was just --

19          THE COURT:  She's laying a foundation.

20  BY MS. JUAREZ:

21      Q.  Did SIA Estrada come to you with -- did he

22  provide a reason for which he wanted you to surveil

23  Ms. Lorena Guthrie?

24          THE COURT:  What did he tell you?

25          THE WITNESS:  He told me the whole thing had

1384

1  transpired overnight where she had a problem with her

2  computer.  And what he told me is that he wanted me to go

3  into the computer and see what she was doing at the time,

4  which I can't do.  It's a violation.

5  BY MS. JUAREZ:

6      Q.  And what do you mean by it's a violation?

7      A.  One of the things that has been sent down from

8  D.C. were the instances that we could do a forensic

9  examination of a computer, and then other instances where

10 we would be able to do it but only under the approval of

11 D.C.  we would have to get D.C. to grant us approval to

12 do that prior to doing the investigation.

13     Q.  Is that something like a workplace computer, for

14 example, has a reasonable expectation of privacy and so

15 you can't surveil -- is that --

16     A.  It's that she has her own PC that's hers at her

17 desk and so she has a reasonable expectation of privacy.

18 In other cases where it's a public computer, then it's

19 not so much.

20     Q.  So SIA Estrada came to you and said he needed

21 help to do something with respect to Lorena Guthrie?

22     A.  He didn't tell me what he wanted to do or how he

23 was trying to do anything.  But what he did say when he

24 left my office is, he yelled out, "Nobody's going to help

25 me bust her.  I can't get anybody to help me bust her."

1385

1      Q.   When SIA Estrada left, I believe earlier you

2   mentioned that Warden Rios also requested that you

3   surveil Ms. Lorena Guthrie; is that correct?

4      A.   Yes.

5      Q.   Do you remember what Warden Rios asked you to

6   do?

7      A.   He asked me to do the same thing.  He came down

8   to the office after the second Estrada visit about five

9   minutes later.

10          THE COURT:   Second Estrada visit?

11          THE WITNESS:   Estrada came in initially, asked

12   for that.  And that's when he stormed out and said,

13   "Nobody's going to help me bust her."  And he went

14   storming off.  About ten minutes later he came back and

15   made essentially the same request, you know.  And I was

16   very specific with him that it wasn't going to happen.  I

17   wasn't going to do that.  And I told him Mr. Cane -- AD

18   Cane has a memo out that specifies the parameters of when

19   we can and when we cannot do a forensic examination on

20   the computer.

21          THE COURT:   So Associate Warden Estrada came

22   back in the second time and you told him the same thing

23   over again or what?

24          THE WITNESS: Correct.  I said, "Changing the

25   words doesn't change the action.  You're not going to get

                                                          1386

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

1    me to change -- the decision's made.  I've made my

2    decision.  It's not going to happen."

3              THE COURT:  And how did he change the words?

4              THE WITNESS:  I can't remember.

5              THE COURT:  If you recall.

6              THE WITNESS:  It was the same request but just

7    framed differently.  He just framed it differently.  And

8    it's not going to happen.  You know, I mean framing it

9    isn't going to change the fact that you want me to go

10   into the computer and do an illegal activity.  So that

11   was the answer, was no.

12             THE COURT:  And that's what you had told him the

13   first time, that you considered it -- did you tell him

14   the first time that you considered it to be an illegal

15   activity?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  Go ahead.

18   BY MS. JUAREZ:

19        Q.  I believe I asked you and I'm not sure we got

20   the answer, Mr. Carstersen, of what Mr. Rios had asked

21   you.  Do you recall what he asked?

22        A.  He asked, you know, what was going on with it.

23   And -- which seemed strange, you know.  I mean, the

24   warden never came down to my office.  The warden never

25   came down to my office and here he is five minutes later

1387

1  after Estrada leaves coming into my office.  So he --

2          THE COURT:  When Estrada left the second time?

3          THE WITNESS:  Correct, yes.  And it was the same

4  question.  It was, you know, what are we going to do

5  about her computer.  And I told him, I said, "Well, we

6  can go to D.C. and request OIA to approve us for an

7  investigation.  We can do it in a day.  It's relatively

8  quick and no big deal.  But until then, we can't do

9  anything.  You know, I'm not going to be able to do

10  anything."

11  BY MS. JUAREZ:

12          Q.  Did -- how did Rios respond?

13          A.  Oh, he was mad.  He was mad.  He told me, he

14  said come down to his office.  Come down -- in five

15  minutes come down to my office.  I want to talk to you.

16          Q.  And did you go down to his office?

17          A.  Yeah, I went down to his office.  Yeah.  It was

18  just he and I.  And he said -- you know, he said, it's a

19  one-way conversation here.  We're having a one-way

20  conversation.  Because when I came down I brought the

21  Cane memo with me.  The memo that Mr. Cane put together,

22  a three-page memo, outlines what he expected us to do and

23  gave examples of when we could and when we couldn't do an

24  examination.  And so I had that memo for him, you know.

25  Not to say here you go, but just to say, you know, we can

1388

1   go over this.  I can show you exactly what I'm talking

2   about.  And he didn't want to hear that.  He didn't want

3   to have anything to do with that.  It was from what --

4   you know, what he said, it's a one-way conversation.  And

5   then at that point he began to tell me that I needed to

6   get with the program.  You know, that this kind of action

7   wasn't with the program.

8        Q.  Did Warden Rios make any threats to you at that

9   time personally?

10       A.  No personal threats, no.

11       Q.  Or any threats to your job security?

12       A.  No.

13       Q.  Earlier you mentioned that it would be a quote

14   unquote violation; is that right?

15       A.  Correct.

16       Q.  And were you referring to -- is this a new

17   policy that is at USP Atwater or is this policy -- I'll

18   just stick with that.

19       A.  That policy has been around for a while and it

20   hasn't changed at all.  It was -- that policy, when I was

21   in Dublin, that policy came out.  So I'd say that was

22   about 2004 or 2005 he came out with that.

23       Q.  And is there a similar policy for the PDS?

24       A.  PDS is covered under Program Statement 1237.13.

25   And in there -- if you're referring to the access to the

1389

1   off; correct?

2        A.   Correct.

3        Q.   So the only role you had in Dr. Kodger's

4   disciplinary action, the one in which she was suspended,

5   was when you were asked to deactivate her computer

6   account?

7        A.   That's correct.

8        Q.   And if a staff member is not suspended -- okay.

9   If a staff member is not suspended and not removed, is

10  there any other disciplinary action taken against a staff

11  member?

12       A.   I don't know what the warden's options are.  I

13  guess whatever admonishment, I guess, the warden could

14  impose.

15       Q.   So like a letter of reprimand, for example?

16       A.   Correct.

17       Q.   And in a letter of reprimand situation, you're

18  not called upon by Human Resources to deactivate any user

19  accounts; is that correct?

20       A.   No.

21       Q.   No, that's not correct?

22       A.   No, that is correct.  Yes.

23            THE COURT:  You were never asked to -- I didn't

24  hear any testimony -- let's put it this way -- so far

25  that you were asked to surveil Dr. Kodger as you had been

1  asked to surveil Ms. Guthrie.  Is that correct?  That's

2  what I understand the state of testimony to be at this

3  point.

4          THE WITNESS:  That's correct.

5  BY MR. BAUCH:

6      Q.  Isn't it correct that your knowledge about the

7  incident leading up to Dr. Kodger's suspension was gained

8  from your conversations with Dr. Kodger?

9      A.  Could you say that again.  I'm sorry.

10      Q.  Your knowledge about the incidents that led up

11  to the suspension of Dr. Kodger, you learned about those

12  incidents through conversation with Dr. Kodger?

13      A.  Correct.

14          MS. JUAREZ:  Vague and ambiguous.

15          THE COURT:  Overruled.

16  BY MR. BAUCH:

17      Q.  In your -- the same EEO affidavit that we were

18  just talking about, turn to Page 0057.  And I'm looking

19  at your answer -- let's see.  Counting from the top --

20  there's an A at the top.  Let's see.  Just counting As

21  and looking at one, two, three, four, five, six, the

22  sixth A down, and your first sentence is this:  "Well,

23  unprofessional conduct is catch all."  What do you mean

24  by that?

25      A.  Just what it says, is it's a catch all.  If the

                                                      1407

 1  to go inside the USP to see inmates or staff members?

 2      A.  Correct.

 3      Q.  Do you know if during that time period she was

 4  expected to report to mainline?

 5      A.  I couldn't tell you for sure to be quite honest

 6  with you.

 7      Q.  So if she wasn't allowed to go inside the USP to

 8  see inmates or staff members, do you think that it's

 9  likely she went into mainline during the time period she

10  was in that office?

11          THE COURT:  That calls for speculation.  I mean,

12  he's testified he didn't know what the story was.  Why

13  ask him to speculate about what might have happened.

14  BY MR. BAUCH:

15      Q.  What was it that SIA Estrada was concerned

16  Ms. Guthrie's computer -- what was the specific thing

17  that he was worried she was doing with that computer?

18      A.  I couldn't tell you.  I believe he was trying to

19  find out if she was using it for something she shouldn't

20  have.

21      Q.  Okay.  And is -- do staff members at USP Atwater

22  sometimes use their computers for activities that are not

23  work-related activities?

24      A.  Yes.

25      Q.  And do those staff members sometimes end up in

                                                      1424

1   trouble -- in the disciplinary process as a result of

2   that misconduct?

3        A.   I couldn't tell you if they do or not to be

4   quite honest.

5        Q.   Do you ever -- have you had -- during

6   Warden Rios' tenure did you have any staff members

7   engaged in looking at pornographic material on their

8   personal computers at work?

9            MS. JUAREZ:   Speculation.

10           THE COURT:   He can testify to what he knows.

11           THE WITNESS:   I didn't do any forensic

12   examinations for that.

13  BY MR. BAUCH:

14       Q.   Did you ever find, during Warden Rios' tenure,

15  any evidence of any staff members misusing their

16  computers at work?

17       A.   No.

18       Q.   Now, you testified that on direct, that there

19  was a problem with that computer that Ms. Guthrie was

20  using and it prevented the computer from continuing to be

21  used; is that correct?

22       A.   Correct.

23           MS. JUAREZ:   Misstates --

24           THE COURT:   He affirmed so I guess he thought it

25  was the statement.

1425

1              THE WITNESS:  It -- the computer was --

2   BY MR. BAUCH:

3        Q.  What was wrong with the computer?

4        A.  There was a virus detected the night before.

5   She was working an evening shift and a virus detection

6   came on.  And that's what the issue was.  So the computer

7   still would power on, you could still utilize it.  But

8   she, as a good computer user, knew that stop using the

9   computer when you get a virus alert and notify me.

10       Q.  Okay.  Now, her computer -- her workstation was

11  in the SIS department?

12       A.  Yes.

13       Q.  And where was the SIS department?

14       A.  Down the hall.  It's down the hall.

15       Q.  From your office?  It's in the administration

16  building down the hall from your office?

17       A.  Yes.

18       Q.  Was she -- was that a computer that only she

19  alone used or did other staff in that office share that

20  computer?

21       A.  She used that computer.

22       Q.  And when you talk about -- you kept using the

23  term "surveillance" on direct examination.  Isn't it true

24  that the SIA, Mr. Estrada, was trying to find out if

25  Ms. Guthrie had gone to an unauthorized location on the

                                                    1426

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

1    internet with that computer?

2         A.   I'm only speculating on what he --

3         Q.   Don't.   I don't want to ask you to speculate.

4    And Mr. -- the judge asked a question of you during

5    direct examination referring Mr. Estrada as the associate

6    warden, but that is not correct?

7         A.   That's not correct.

8         Q.   He's a special investigative agent; is that

9    correct?

10        A.   Correct.

11             THE COURT:   Thanks.   I stand corrected.

12   BY MR. BAUCH:

13        Q.   What's the difference between -- and for the PDS

14   database, what's the difference between -- well, I guess

15   what is read-only access?

16        A.   Read-only access allows you to read the data

17   that's in there, but not change the data that's in there.

18        Q.   Okay.   Do you know if the access the was

19   permitted by Daniel Fass to John Bell and Craig Swartz

20   was read-only or some other status?

21        A.   I can't remember if it was read-only or

22   administrator.   I think it was just a -- or a regular

23   user.   I honestly can't remember what access it was.

24        Q.   And do you know how long John Bell and Craig

25   Swartz had access to that PDS?

                                                        1427

10:23   1          A.    Usually not, yes.

10:23   2          Q.    Okay.  Did you investigate or try to initiate

10:24   3    an investigation against a female employee named Lorena

10:24   4    Guthrie?

10:24   5          A.    No.

10:24   6          Q.    Did you ask Mr. Carsterson to give you access

10:24   7    to her computer terminal?

10:24   8          A.    No.

10:24   9          Q.    Did you express some concerns to

10:24   10   Mr. Carsterson about Ms. Guthrie's use of her computer?

10:24   11         A.    I -- I think so.  On several occasions her

10:24   12   computer crashed, and it was unusual to have just a

10:24   13   computer go down like that, so I think I asked him to

10:24   14   find out why this computer was -- was doing this.  She

10:24   15   was working off hours, and when computers go down like

10:24   16   that, you get no productivity.

10:25   17         Q.    Now -- and that is an issue that you brought

10:25   18   to the warden's attention, Ms. Guthrie's use of her

10:25   19   computer?

10:25   20         A.    I might have, yes.

10:25   21               THE COURT:  Well, when you say you might have,

10:25   22   do you recall doing so, or you don't recall whether you

10:25   23   did so?  I mean might have, you know, that's not very

10:25   24   helpful.

10:25   25               THE WITNESS:  I think that what I said was,

2275

10:25   1    hey, something's going on with our computer system, it

10:25   2    keeps crashing.  And I believe that -- after that is

10:25   3    when I went to see Charlie.  So I would say yes to your

10:25   4    last question then.

10:25   5              THE COURT:  Charlie is?

10:25   6              THE WITNESS:  Carsterson, I'm sorry.

10:25   7              THE COURT:  That's okay.

10:25   8    BY MR. LITTLE:

10:25   9        Q.   And also regarding Ms. Burghardt-Cobb -- and

10:25   10   I'm sorry, I didn't finish the four of them -- did --

10:25   11   was Warden Rios ever critical of her in your presence?

10:26   12       A.   No.

10:26   13       Q.   Did he ever -- was he ever critical about the

10:26   14   way that she did her job?

10:26   15       A.   No.  Not to me.

10:26   16       Q.   Okay.  Did he ever make his feelings known to

10:26   17   you about any of these four complainants that he felt

10:26   18   that they were poor performers?

10:26   19       A.   No.

10:26   20       Q.   Or that they were poor communicators?

10:26   21       A.   No.

10:26   22       Q.   Did -- Rios had -- he's not a soft-spoken

10:26   23   person; is that correct?

10:26   24       A.   That's correct.

10:26   25       Q.   Warden Rios is someone that you would

                                                              2276

02:12  1    is the flip side of that issue -- did you receive any

02:12  2    reports from female staff regarding inappropriate

02:13  3    remarks by male staff members to them?

02:13  4        A.   No, sir.

02:13  5        Q.   Let me see if I can -- if this refreshes your

02:13  6    memory.

02:13  7             Did you have a staff member named Lorena

02:13  8    Guthrie during your tenure as warden?

02:13  9        A.   Yes, sir, I did.

02:13 10        Q.   And did she complain that Mr. Estrada, your

02:13 11    SIS leader, had made inappropriate remarks to her?

02:13 12        A.   Yes, she did.

02:13 13        Q.   According to her, reportedly he made a remark

02:13 14    about whether or not she had ever had a Texas longhorn?

02:13 15        A.   I don't remember the recall -- I don't recall

02:14 16    the statement that was made.

02:14 17        Q.   And did -- did you, as the warden, address

02:14 18    that issue?  Did you investigate that?

02:14 19        A.   I had a conversation with Mr. Estrada, and he

02:14 20    said that he did not say anything.

02:14 21        Q.   Okay.

02:14 22        A.   To my knowledge.  I do remember that, sir.

02:14 23        Q.   Was that the sum total of the investigation?

02:14 24        A.   Yes, sir.

02:14 25        Q.   Okay.  Shortly after that complaint, did you

                                                                    3157

02:14   1   authorize an investigation regarding how Ms. Guthrie was

02:14   2   using her computer?

02:14   3         A.     Yes, sir, I did.

02:14   4         Q.     And was Mr. Estrada involved in that

02:14   5   investigation?

02:14   6         A.     I don't recall if it was him that conducted

02:15   7   the investigation or somebody from the outside.

02:15   8         Q.     I mean, I'll submit to you that Mr. Estrada,

02:15   9   he testified last week -- I think last Wednesday, and he

02:15   10   testified to having some interaction with Mr. Carsterson

02:15   11   regarding Ms. Guthrie's computer?

02:15   12         A.     Mmmm-hmmm.

02:15   13         Q.     Does that refresh your recollection --

02:15   14         A.     Yes, sir.

02:15   15         Q.     -- as to whether he was involved?

02:15   16         A.     Yes, sir.

02:15   17         Q.     He was?

02:15   18         A.     He was -- I was the one that conversed with

02:15   19   the computer services guy. I needed for him to download

02:15   20   everything -- or remove the computer. I think it was to

02:15   21   remove the hard drive from there so we can look into it

02:15   22   to see what was going on. Yes, sir.

02:15   23         Q.     Would you agree that a more thorough

02:16   24   investigation was made into Ms. Guthrie's computer

02:16   25   practices than her sexual harassment complaint?

3158

02:16  1          A.    I didn't see it as a sexual complaint.   There

02:16  2    were things in that computer that were not supposed to

02:16  3    be.   She was going through some websites that she

02:16  4    shouldn't have been going to.

02:16  5                THE COURT:   Let me just --

02:16  6                THE WITNESS:   Yes, sir.

02:16  7                THE COURT:    -- I want to put you on notice,

02:16  8    because Mr. Little knows this and Mr. Bauch I think

02:16  9    knows this, Ms. Guthrie has a formal case -- an EEO

02:16  10   complaint as well, and that case is pending before me.

02:16  11               So I may or may not hold a hearing on that

02:16  12   case, but I want to alert you that I'm not totally

02:17  13   unfamiliar with that case.   I'm not as familiar with

02:17  14   that case as I am with this, I can thankfully say, but I

02:17  15   want you to be aware of that, because I know Mr. Little

02:17  16   knows that.

02:17  17               MR. LITTLE:   Yes, your Honor.

02:17  18               THE COURT:   And I don't want you to feel like

02:17  19   you're being sandbagged here by me also knowing

02:17  20   something about that.   Okay?

02:17  21               THE WITNESS:   Yes, sir.

02:17  22               MR. LITTLE:   And I apologize.   I had assumed

02:17  23   from the ROI that he was aware, but I should have said

02:17  24   something.

02:17  25               I apologize.

                                                              3159

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

02:17  1    BY MR. LITTLE:

02:17  2          Q.    When I asked if there was a more thorough

02:17  3    investigation into the sexual harassment complaint, I

02:17  4    wasn't talking about Ms. Guthrie's computer.  I was

02:17  5    talking about her original complaint that Mr. Estrada

02:17  6    had made an inappropriate comment to her.

02:17  7          Would you agree that there was a more thorough

02:17  8    investigation into the -- what Ms. Guthrie was doing

02:18  9    with her computer than her prior allegation that

02:18  10   Mr. Estrada had said something inappropriate to her?

02:18  11         MR. BAUCH:  I'm going to object at this time.

02:18  12   It's getting very far afield.  Ms. Guthrie is not a

02:18  13   department head.  She's not been involved in this case.

02:18  14   Because Mr. Little does represent Ms. Guthrie and there

02:18  15   is that second case pending before your Honor, I think

02:18  16   this is probing a little too deeply into that.

02:18  17         MR. LITTLE:  I think it's evidence,

02:18  18   potentially at least, of gender bias on behalf of the

02:18  19   witness, your Honor.

02:18  20         THE COURT:  Well, it certainly could be a

02:18  21   pattern of reprisal if everything fell the way

02:18  22   Mr. Little and his client would like it to be.  Because

02:18  23   there's reprisal allegations in this case, I'll let you

02:18  24   ask one or two questions more, but then we're going to

02:18  25   have to move on.

                                                              3160

02:18  1          MR. LITTLE:  Thank you, your Honor.

02:18  2          THE COURT:  So your objection is overruled.

3     BY MR. LITTLE:

02:18  4          Q.   Do you have the question in mind, Warden Rios?

02:18  5          A.   Can you please repeat it?

02:19  6          Q.   Sure.

02:19  7               Would you agree that there was a more

02:19  8     extensive investigation into the issue of how

02:19  9     Ms. Guthrie was using her computer than into her prior

02:19  10    allegation regarding the inappropriate remark made to

02:19  11    her by Mr. Estrada?

02:19  12         A.   I don't believe so.

02:19  13         Q.   And I hate to go back to this, and hopefully I

02:19  14    won't spend too long on it.

02:19  15              The innovation that you made as warden was not

02:19  16    to give restricted inmates the $25 a month, but instead

02:19  17    to allow them to spend that on hygiene products; am I

02:19  18    correct?

02:19  19         A.   That's correct.

02:19  20         Q.   Okay.  The $25 a month, that's part of the

02:20  21    program statement that applies across the entire bureau,

02:20  22    correct?

02:20  23         A.   That's correct.

02:20  24         Q.   Do -- you were asked about mainline on

02:20  25    redirect.

3161